Case number 17-1110, NextEra Energy Resources, LLC Petitioners v. Federal Energy Regulatory Commission. Mr. Estes for the petitioners, Ms. Banta for the respondent, and Mr. Marshall for the intervening. Good morning. Good morning. May it please the Court, I'd like to reserve three minutes for a vote. This case raises the question whether FERC has complied with State Farm and its multiple progeny and the substantial evidence rule. While FERC reversed direction, found a new true north on legal and policy issues, even after this Court confirmed them, and while they have flipped back to their original position about a month ago, we're not raising that here today as our primary issue. The question is, did they justify the outcome? And I submit to you the answer is a resounding no. In fact, they proved our point, and let me explain that by starting with the price effect estimates that were in the record here. There were several iterations of this. The Commission depicts this case as a war between different experts and their chosen expert, Dr. Ethier of Friesland, New England, had better estimates, but he actually didn't make any estimates. He has one paragraph on this ubiquitous page 41 of his testimony, 141 in the JA. It has some sort of assumptions and conclusions that now have been disowned by ISO New England. We put in hard numbers, and the Commission never really grappled with them, but if you look at the rehearing order on pages 632, 33, footnotes 95 and 96, you'll see them dense with numbers. And at the end, what the Commission is doing is they're taking two options that occurred after all of this was filed, numbers 9 and 10, and they're saying, well, we see evidence here that what you call the supply curve is flatter than your experts anticipated, so your numbers are wrong. You're on the high side. You're still positive, but you're on the high side. Not so. While we had iterative estimates of price effects, one of the experts below, this is discussed in our brief, Mr. Schnitzer, had alternatives, and he actually was spot on with the Commission's figures, starting with a low number of 28 cents per kilowatt month, identical to his and identical to what's in FERC's footnote earlier in their order. The estimates range on. He's one cent below FERC on the mid-range number here. He's five cents below on the high-range number FERC puts out in footnote 95. And he says in unrebutted fashion, FERC never deals with this, this is a 5 to 10 percent price effect reduction. You could size it, if you look at our brief on page 17, 100 million, maybe up to $600 million. And we're told that that's okay because the price effect is, quote, limited, which I guess means taken directly, it's not unlimited and it could have been worse, but it's still substantial, and FERC blinked past that. Instead, they offer us the ubiquitous page 41, where everything the gentleman said, Dr. Ether, has proven wrong. It was wrong when FERC acted on remand. Let's take the demand curve, the first thing they talk about. Well, we've moved from a vertical to a sloped demand curve, so this is better for you. Yes, but it still could be bad, and in fact, FERC's numbers prove it could be bad. And while this case was pending on remand, FERC adopted a new demand curve, which actually makes matters worse, about 42 percent worse. And their answer to us, upon complaining about this increased injury, to say, yes, well, but demand curves change. That's a separate docket, and too bad. The second thing they point to is load growth, or no, the size of the exemptions. Well, it's true that that affects things somewhat. It means things aren't unlimited. The 200-megawatt limit at least had a basis in the record, though it fell away, as I'll explain in a second. The 600-megawatt limit was never explained, never justified, never tied to anything. It was picked out of thin air. We pointed this out in our blue brief and our gray brief. The red brief has no answer, and on that ground alone, we submit to you remand is appropriate. The third pillar to FERC's collapsed tempo is load growth, which was pegged at 189 megawatts, grossed up to 200. That's where we're going with this. Well, it turned negative while this case was pending and by the time it got back on remand, which means that the page 41, JA-141, turned upside down. On brief and on the orders on remand, FERC started to focus its attention differently and say, well, retirement still exists. They're big, so that's the horse we'll ride now. There's several problems with that. One problem is they're turning back to this ubiquitous page 41 now to zone, but page 41 gives retirements a very limited role. It says we need to have the exemption take up load growth, and retirements are for the merchant entry, the entry that gets into your NEPCA decision defense, because that's how we get prices to clear at the cost of new entry. That's how they stay competitive, and that would mean that all of these exempted resources don't affect things very much. But if you move retirement over to the renewables exemption side of the ledger, you erode that assumption. FERC sort of blends and matches retirements in so one might think it can be a free agent. They say in their brief that load growth, even if flat plus retirements, the orders never say that. Retirements is enough standing alone, and you're being asked to violate chittery by affirming if that's what you hear today. Compounding matters, and to demonstrate that retirements is not the only pillar to this collapsed temple, FERC says surprisingly that, well, the load growth assumption that we adopted at the beginning of this case and hold still true to the end was based on the best projections available at the time in 2014. So they've been proven wrong, and the record's still open here, but we're going to continue to embrace them. Substantial evidence, though now wrong, is sufficient to support our decision here. We submit to you that that cannot stand. Finally, when it comes to justifications, the commission says something I find actually really surprising to come from an economic regulatory agency and really surprising to be before this court, which has an important role in reviewing economic regulation by the United States government. They actually repudiate the scientific method. They repudiate a central mainstream element of economic thought, ceteris paribus, holding all else equal. They claim at 62223 that our expert analyses aren't valid because we held all things constant. We only measured one thing. What happens if you don't have the 200-megawatt exemption every year, or you do? That's how science works. That's how they tell whether blood pressure medication actually works or not. That's how the scientific revolution gained traction. That's how economics works. That's Alfred Marshall from 1890. That's actually what supply-demand curves are. And, in fact, it's what the demand curve here is. The demand curve here only does one thing. It says the government will approve what price changes should occur upon changes on quantity. It holds all else constant itself. If we can't test it by holding all else constant, how can FERC ever figure out whether anything it's doing in these markets is defensible or has just and reasonable outcomes? This is an example, I think, of the agency going so far beyond the realm of what is rational economic thought that it punctuates the need for remand. The 28J letter we put in actually validates what the last two pages of our reply brief say, which is we've been banging the drum about all these changing factors for a long time, and the eighth-year page, 41, has as its assumption that you're at equilibrium, so you need new merchant entry every year, and that's going to keep the price at the same level. But we're actually not in equilibrium because we've had negative load growth. So now we're in a situation where nothing Ethier said holds true. They just told the commission that. The commission just approved that order, and under Burlington truck lines, we would say you really can't affirm, even if we hadn't raised all this blow, but you had. If there are no questions, I've got a scant amount of time for rebuttal. I'd like to say. We'll give you some more time for rebuttal. Thank you. Good morning. Carol Banta for the commission. I'll begin where Mr. Estes left off with the 28J letter about the newer filing that New England made, even though it's not before this court. It is relevant because it's important to understand what New England did or didn't say, and the commission did or didn't say with regard to that. The system operator did not disown its previous mechanism, the one that's before you now, didn't say it was unjust and unreasonable. They said they had come up with a better way, which is exactly what we told them to do. We repeatedly said if load growth doesn't pan out in accordance with the best estimates, the system operator is going to revisit it. We said at least one time that we continue to encourage the system operator to work with its stakeholders to improve the process. That's just what happens in all of these capacity markets. They found something that they think will be more effective for a variety of reasons going forward. Of course, under Section 205, they don't even have to think it was better. In this case, they did say to the commission, we believe this is superior. In any event, the commission, at least in the initial order, which is now pending on rehearing, agreed that it was just and reasonable. I don't think the commission had to decide whether it was better, and no one declared that the previous mechanism was unjust and unreasonable. It's just moving forward with what they consider to be an improvement. That's completely fair, and it's indeed exactly what the commission always tells these system operators. Monitor how this is working. If it's not working out the way you thought it would, revisit it. Specifically in this case, the commission was very sure to say that a number of times. If you can improve the process with your stakeholders, by all means, bring us another 205 filing with that. There's nothing unusual, and it really doesn't have any significance for whether this was just and reasonable at the time that it was approved. Going to what the commission had at the time it was approved in front of it, in support of the 205 filing by the system operator, it's not just the portion of one paragraph by Dr. Ethier that the petitioners point to. Dr. Ethier had extensive testimony, most of which was about the slope demand curve, but he said several things that are relevant to explaining the expected dynamics of the supply and demand curves. And in these capacity markets, this court has seen this many times, an economist puts in testimony about how these market forces are expected to work, how adjusting a demand curve this way and a supply curve this way is expected to play out based on what the system operator knows about their own system. So one relevant part, even though he was talking about the slope demand curve, I'd point the court to JA 108 and 109. At the paragraph that begins on that page and carries over, he talked about how if there was a deep pool of competitive entrants, whether the demand curve at true net cost of new entry is a little short or a little long, I'm paraphrasing there, will have only a small effect on price because the competitive entrants will create a relatively flat elastic supply curve. So what he's saying is that if there is a deep pool of competitive entrants, you're not going to have the steep supply curve that the commission discussed the petitioners experts having relied upon. It will flatten around the point where it intersects with the slope demand curve in a way that the vertical demand curve was more of an all or nothing proposition so that the prices won't vary as much around that intersection. And that's actually what happened in auctions eight and nine. The commission pointed out, I believe it's somewhere around JA 632, but I'll get that for you exactly. It's in the footnotes discussing what happened in those auctions. And on remand, the commission was just looking to what happened in the auctions to substantiate the evidence it had before it earlier. It's an unusual stance. We don't usually look to later evidence when we're really further explaining things that we should have maybe explained more fully at the outset. But the commission said in footnote 95 on 632, there was an additional 1,000 megawatts of supply available pretty close to the same clearing price. So the supply curve, instead of going like this, was like this. If the demand curve had been moved farther over, if there had been more entry. So I can take you off of that track for a moment. Sure. Going through the more mundane elements of administrative law. The petitioner is alleging that FERC has changed its position on out-of-market entry without an adequate explanation. When I looked at the language quoted by the petitioner, I found that they correctly are saying that the FERC seems to pretty much say our position has evolved. Yes. That's a lot like saying it changed. Now, we certainly have lots of precedent that says an agency can change. But we say that in order to avoid being arbitrary and capricious, they have to explain why they changed, not just say, all right, we've changed. Right. Have they given us an adequate explanation here? They have. Tell me about it. Give me a citation. Well, I think the commission best ex—I have a few places, but I'll start with the remand rehearing order at, I hope I'm giving you the right one, at paragraphs 67 and 68. I have a few others if that's not the one I was looking for. Give me the page of the JA if you will. Yes, 652 and 653. Say it again. Say it again. I'm sorry. I'm having a little trouble with my hearing aids. I know. I literally am. So if you can give me the— Okay. 652. Okay. And 653. I think we also would look at—let me go back one more order. But I can explain what the commission says it evolved about. There's one other site on 556 and 557. The commission says— That's the ones I had marked, 556 and 557. And what the— Tersh would be a generous way, I think, of describing their explanation there, wouldn't it? Well, that's why it does have more at the other site that I gave you, I think. What the commission says at a variety of places in this order is if we take the finding, the critical finding, that this exemption was going to be limited both by the slope demand curve and the cap, the commission is then balancing it against the—I'll lay out exactly what it says it's balancing. It's balancing its responsibility to promote economically efficient prices. And it's talking about the price signals, what the effect of the renewable entry would be if it's not somehow accounted for. The price signal is actually false if it's signaling the need for new entry, ignoring the new entry that's there. So how do we account? Wouldn't any prudent company take that into account before making a multimillion-dollar investment in a new generating facility? They wouldn't just look at the so-called false signal. They would take into account the fact that there are all these renewables out there. Well, the commission treats the capacity market—the purpose of the capacity market is to generate the price signal. So the commission wouldn't lightly discount it and say, well, everyone knows it's false, so it has no meaning. So the commission wants the price signals generated. I mean, this is about making sure the capacity market is a just and reasonable mechanism. And that includes, is it sending accurate price signals? Is it incentivizing new entry that the system needs? And is it ensuring fair prices for consumers? And these all go into the mix. And what the commission is saying it evolved on is if states—if the system operator wants to accommodate legitimate policy objectives of its states, and the commission is willing to look at that balance—again, it's not throwing away the idea of price suppression. This is very much tied to the finding that it would be limited and would not be significant price suppression. Without that, the rest of this balance doesn't happen. It's not just, oh, we want to accommodate the states, so that's it. I think I'm out of time, so I do want to answer any other questions, but thank you. Thank you. All right. Mr. Marshall. Good morning. Jason Marshall for Intervenors on the Brief in support of Respondent. If I could build on my colleague's responses to Judge Sintel's question regarding FERC precedent, in terms of any evolution that happened, to clarify the record, it wasn't— No, it's not just any evolution that happened. The commission seems to be admitting that evolution has happened. It's not just that petitioners allege it. They use the language themselves at least twice. I agree, and I would clarify that the evolution is from—FERC never said that a renewable exemption was unlawful under the Federal Power Act. They were in favor of more of a categorical case-by-case exemption, and what happened here is their thinking evolved to support a broader exemption, which is the one that the sister operator filed, and that was based on a specific record before them that included a significant design change, the slope demand curve being implemented in the region, as well as supporting the record from the system operator, describing its estimate of the potential impact that the rule would have on the system as well. In addition, I'd note, going back even further, far from being inconsistent with precedent, FERC has always kept the door open to this exemption going back roughly 10 years. They've considered some form of exemption again going back some time now. They've always kept the door open, emphasizing that the proper vehicle for bringing this rule forward was through the stakeholder process, which is what happened here in this case, and it came through a balanced package of rules, some of which were more favorable to suppliers and some of which were more favorable to consumers. In addition, Your Honors, I'd like to briefly also add to the response regarding the more recent FERC order around the capacity market, which was filed with the Court this week, and also to clarify, the genesis of that proceeding was not this question of load growth. The early paragraphs of that order tell the tale. Really, the genesis of that was a collaborative discussion among the system operator, market participants, and the New England states. And if you read the early paragraphs of that order, it was driven by changes in state law, where new resources were coming online pursuant to state programs, and there was a concern that those resources might not be counted as capacity and wouldn't be included under the existing renewable exemption definition, as well as could be at a level that wouldn't come under the 200-megawatt cap. Now, prices were definitely at issue and price protection was at issue. That proceeding, similar to this one, talked about a balance between supplier and consumer interests. And ultimately, when the ISO made that filing, it was also attempting to balance those interests and accommodate state policies while at the same time ensuring that the market price signal stayed intact. Unless the Court has any questions, I see that my time is up. Thank you. Thank you. All right, Mr. Estes, we'll give you two minutes for your vote. I'll be brief and I'll go directly to the questions that Judges Sintel and Randolph were asking. I was going to do it topside, but I ran out of time. What changed? Because the position changed. And if you look at, by the way, paragraphs 21 and 22 of the order I sent in on Monday, you'll see it's changed back. Now price suppression for vinegar is a really important thing. One of the things that changed is the Commission decided, as our brief colorfully explains, acquiescence is a defense. If they're going to do it anyway, we were just bluffing and we won't mitigate them. We submit to you that's a bankrupt reason at the outset. Yes, it implies that new entry will occur and not be reflected in the capacity market, but Judge Randolph, you're right, it will be there in the real world. So people were going to model that into their entry obligations. But whatever happened to the protection of price outcomes and incumbent suppliers, this Court affirmed in NEPCA. This Court started a process for, in the Connecticut case, the Third Circuit affirmed, which says if they have to pay for it twice, that's their choice, which is what building means, by the way. You're not sort of paying for it twice, because we need to prevent prices from being artificially suppressed, which is economically inefficient. And as we said in brief, one thing hasn't changed. Court can't change the law of economics. That is an inefficient outcome, and they've said that before and they've just said it again. One final point. What is really happening here is not paying twice for, oh, 100 megawatts, maybe $10 million worth of capacity. Does the renewable get it? Does an incumbent generator get it? What's really happening is, does the state get to have the benefit of 100, 200, $600 million of annual price suppression to subsidize the investments they want to make? That's really the question, because you can make back your entry on volume with price suppression and properly prevented that before. They need to explain why they didn't do it here, because they haven't explained their departure. If there are no further questions. Thank you. We'll take the case under advice.
judges: Wilkins, Sentelle, Randolph